[Cite as *State v. Stober*, 2014-Ohio-1568.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                  CASE NO.  12-13-09

      v.

JEREMY STOBER,                          **O P I N I O N**

      DEFENDANT-APPELLANT.

---

**Appeal from Putnam County Common Pleas Court**
**Trial Court No. 2012 CR 89**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:   April 14, 2014**

---

APPEARANCES:

    *F. Stephen Chamberlain* **for Appellant**

    *Todd C. Schroeder*  **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant Jeremy Stober ("Stober") appeals the March 28, 2013, judgment of the Putnam County Common Pleas Court sentencing Stober to an aggregate prison term of 10 and one-half years following Stober's jury trial convictions for Sexual Battery in violation of R.C. 2907.03(A)(7), a felony of the third degree, three counts of Gross Sexual Imposition in violation of R.C. 2907.05(A)(1), all felonies of the fourth degree, and Importuning in violation of R.C. 2907.07(B)(1), a felony of the fifth degree.

{¶2} The facts relevant to this appeal are as follows. On September 17, 2012, Stober was indicted in an eight count indictment for Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree (Count 1), four counts of Gross Sexual Imposition ("GSI") in violation of R.C. 2907.05(A)(1), all felonies of the fourth degree (Counts 2, 4, 6 and 7), Sexual Battery in violation of R.C. 2907.03(A)(7), a felony of the third degree (Count 3), Importuning in violation of R.C. 2907.07(B)(1), a felony of the fifth degree (Count 5), and Attempted Sexual Battery in violation of R.C. 2923.02(A) and R.C. 2907.03(A)(9), a felony of the fourth degree (Count 8). (Doc. 1). The Bill of Particulars specified that there were three alleged victims of the crimes, and that the crimes took place over a time span ranging from 2001 through 2012. (Doc. 158).

**{¶3}** On September 18, 2012, Stober was arraigned and pled not guilty to the charges against him. (Doc. 18).

**{¶4}** On October 31, 2012, Stober filed a "Motion for Relief from Prejudicial Joinder," arguing that "it would be prejudicial to [Stober's] defense to join together in one trial all eight Counts consisting of different victims, spanning a time frame over eleven years." (Doc. 38).[1] On December 14, 2012, the State filed a response to this motion, contending that the law favored joinder, that the offenses were of the same or similar character, and/or that they were part of a course of criminal conduct. (Doc. 54). The State also contended that the testimony of the separate witnesses would have been admissible anyway under Evid.R. 404(B). (*Id.*)

**{¶5}** On January 7, 2013, a hearing on pending motions was held. Regarding the "Motion for Relief from Prejudicial Joinder," after hearing arguments from both sides, the trial court stated that case law supported joinder for similar type offenses and overruled Stober's motion. (Jan. 7, 2013 Tr. at 7). An entry reflecting this was filed January 22, 2013. (Doc. 71).

**{¶6}** The matter subsequently proceeded to a jury trial, which was held on February 25-28, 2013. At trial, the State called 22 witnesses in its case-in-chief

---

[1] Stober also filed various other motions including, *inter alia*, two motions in limine (Docs. 40; 42), a motion for change of venue (Doc. 41), a motion to suppress (Doc. 47), and a motion to dismiss Count 1 of the Indictment (Doc. 66). None of these motions are related to the assignments of error in this appeal, therefore we will not further discuss them.

and 5 rebuttal witnesses. Stober called ten witnesses on his behalf and also took the witness stand himself.

{¶7} Testimony was presented that Stober was a teacher at Kalida High School, beginning in the fall of 1993, and later employed by the school as a technology coordinator, while still occasionally teaching. (Tr. at 1245). Stober was also the high school girls' varsity volleyball coach for Kalida. (*Id*. at 1246-1247).

{¶8} Karen Fortman testified at trial that she took a class taught by Stober in 1994, Stober's second year as a teacher, and that in that class, Stober singled her out and made a "spectacle" of her. (Tr. at 314). Fortman testified that the constant teasing prompted her to leave class one day and go to the guidance office to request out of Stober's class. (Tr. at 315). Fortman testified that after hearing of this, Stober called her to his office after school, closed the door and apologized. (Tr. at 317). According to Fortman, Stober then said that when he looked at Fortman, he thought of her as someone he would want to be married to. (*Id*.)

{¶9} Mary Lynn Lanham testified at trial that she also played volleyball for Stober, and graduated in 2001. She testified that while in high school, Stober sent her messages on ICQ chat. (Tr. at 343). Lanham testified that Stober asked her about her personal life. (Tr. at 343-44). Lanham also testified that Stober sent her a message one day that said if Stober "was [her] age [he] could see [himself] with

[Lanham], that [she] was his type." (Tr. at 344). Lanham showed her mother this message, who testified to the same at trial. (Tr. at 730). Lanham did not report the incident, however, because she did not want it to affect volleyball, which was very important to her at the time. (Tr. at 345).

{¶10} J.L. was the first alleged victim to testify at trial. J.L. testified that she played volleyball for Stober and that she graduated from Kalida in 2002. (Tr. at 357). J.L. testified that one day, Stober called J.L. into his office to talk about a cookout. (*Id*. at 359). J.L. then testified that Stober said he cared about her and her opinion. (*Id*.) Following this comment, J.L. testified that Stober hugged her, pressing against her, having contact with her breasts. (Tr. at 360-361). J.L. testified that the hug felt sexual to her, had a lasting effect on her, and that she did not reciprocate in any manner. (*Id*.) That contact was the basis for the filing of Count 2, Gross Sexual Imposition ("GSI"), in the indictment.[2] J.L. testified that she told her parents about the incident, but she did not want to give up volleyball, so she did not take it any further. (Tr. at 363-364).

{¶11} J.L. also testified that years later, in 2008, she began a teaching career as a substitute at Kalida. (Tr. at 369). J.L. testified that one day in 2009 Stober came into her room, shut the door, and asked her why she did not tell Stober about her pregnancy. (Tr. at 373). Stober also said to J.L. that he thought

---

[2] Stober was acquitted of this charge.

J.L. was going to "wait around for [him]." (*Id.*) J.L. testified that Stober "made some kind of inference about his wife, something happening to his wife," adding, "[w]eren't you going to wait for something to happen to Kristi, so that you and I can be together?" (*Id.*)

{¶12} Jenna Missler testified at trial that she was a Spanish teacher at Kalida. (Tr. at 483). Missler testified that Stober initiated instant-messaging contact with her. (Tr. at 484). Missler testified that the messages began by being work related then became more personal. (Tr. at 484). Missler testified that Stober often sent messages to her that ended in "smiley" faces. (*Id.*) Missler testified that the comments Stober sent her, specifically in 2006-2007, eventually crossed the line, and she brought the comments to the sexual harassment director/coordinator. (Tr. at 512).

{¶13} C.K. was the second alleged victim who testified at trial. C.K. testified that although she was a student at Kalida, she did not have Stober as a teacher and she did not play volleyball. (Tr. at 535). C.K. testified that she came into school one day after she changed her hair color, and while in class she received a text message about her hair looking nice from an unknown number. (*Id.* at 537). C.K. responded by asking who it was, and received the response, "you'll find out." (*Id.*)

{¶14} After talking with other girls, C.K. learned that the number that had messaged her was Stober's. (Tr. at 539). C.K. testified that she and Stober then engaged in regular texting with each other. (Tr. at 542). C.K. testified that the texts were "flirtatious" in nature and that Stober would talk to her about a relationship. (Tr. at 544-545). C.K. testified that Stober told her that he and his wife did not have sex anymore. In addition, C.K. testified that Stober sent her text messages that made her feel good, such as calling her beautiful. (Tr. at 545).

{¶15} C.K. testified that some of the text messages were overtly sexual, with Stober going so far as to say that he masturbated while he thought of her, that "he would be so big he would tear [her] up" and that "he could please [her] and he could do so many things with [her]." (Tr. at 542, 544-45) C.K. testified that Stober told her that he had a video of himself masturbating and that he could send it to C.K. (Tr. at 559). Although the video was never sent, this video was later located on one of Stober's cell phones.

{¶16} C.K. testified to an incident wherein she was alone with Stober in his office, and Stober grabbed her butt and moaned, "grumbling like he liked it." (Tr. at 546). C.K. testified to a separate incident wherein she was alone with Stober in his office, and Stober exposed his penis to her and caused her to touch it. (Tr. at 565). These incidents, alleged to have occurred between March 2010 and

February of 2011 led to the State filing the GSI charge against Stober in Count 4 of the indictment.[3]

**{¶17}** C.K. testified that Stober eventually sent her messages asking about her parents' schedule. (Tr. at 547-48). C.K. testified that she lived with her father, who worked third shift, and that she informed Stober of this. (*Id.*) C.K. testified that about a week after she informed Stober of her father's schedule, Stober showed up at her house around 4 a.m. and knocked on the door. (*Id.* at 552). C.K. testified that

> **I opened the door, I peeked my head around the corner; and I seen him, and I froze. And he had stepped forward into the house, pushing me backwards down onto the couch. Then he started feeling up my shirt and down my shorts, was kissing me. Proceeded to take my shorts off, stuck his fingers inside me and then his penis.**

(Tr. at 552). C.K. testified that she was too scared to say no. (Tr. at 552). C.K. testified that when Stober finished, he pulled up his shorts and walked out the door. (Tr. at 553). According to C.K. this occurred in June of 2010. This incident led to the State filing the Sexual Battery charge in Count 3 of the Indictment.

**{¶18}** C.K. testified that the messages continued from Stober, including continued talk of a potential relationship with C.K. (Tr. at 554). C.K. testified that she told Jeff Burke about the texts and that she was uncomfortable receiving

---

[3] The dates in the Indictment were amended to comport with the evidence presented at trial. (Tr. at 1380).

them. (Tr. at 558). She also testified that she told the guidance counselor about receiving messages. (Tr. at 559). C.K. testified that the text messages stopped around Thanksgiving after she graduated from high school. (Tr. at 569). She testified that she had negative emotions, and later texted Stober, "asking him why he did it." (Tr. at 570). According to C.K., Stober messaged back asking who it was that was messaging him. (*Id.*) C.K. testified that she messaged back, calling him "a sick fuck," a text which C.K. testified Stober never acknowledged. (*Id.*)

{¶19} C.K. testified she did not initially want to come forward to be involved because she was embarrassed, but did so after H.Z. asked her to do so. (Tr. at 582). C.K. testified that Stober directed her to erase a text message Stober had sent her about not being able to have kids, so she had nothing to worry about. (Tr. at 661). This was one of the instances of Tampering with Evidence leading to the filing of Count 1 of the Indictment.[4]

{¶20} H.Z. was the third alleged victim that testified at trial. H.Z. testified that she was a 2012 Kalida graduate who had played volleyball for Stober. (Tr. at 752). H.Z. was also a neighbor of Stober's. (*Id.*) H.Z. testified she was in 7th grade when she received her first text message from Stober, but for years the messages were supportive and volleyball related. (Tr. at 753-754). H.Z. testified that the messages turned sexual when she began dating her first boyfriend. (Tr. at

---

[4] Stober was acquitted of this charge.

757).  H.Z. testified that Stober told her that her boyfriend did not deserve her and that Stober could do better.  (*Id*.)

**{¶21}** H.Z. testified that Stober asked about her sex life and made comments about using his fingers on her, and later, he talked about oral sex.  (Tr. at 754-758).  These messages Stober sent to H.Z. allegedly occurred prior to H.Z. turning 16 and led to the State filing the Importuning charge in Count 5 of the Indictment.

**{¶22}** According to H.Z., the text messages between her and Stober continued through her sophomore year and into her junior year.  (*Id*.)  H.Z. testified that some of the messages, but not all, were sexual.  (Tr. at 762).  H.Z. testified that she had an eating disorder, and was depressed.  (Tr. at 767-768).  She testified that some of the messages Stober sent her were supportive.  (*Id*.)  She also testified that Stober talked about his personal life a lot, saying that H.Z. could "fix" Stober's problems with his wife.  (Tr. at 764, 766).

**{¶23}** H.Z. testified that the summer after her junior year, in June of 2011, she drove to Stober's residence and stopped in the driveway to drop off a paper for a Volleyball camp.  (Tr. at 773).  H.Z. testified that Stober reached past the form she had clearly extended out of the car and grabbed her breast.  (*Id*.)  H.Z. testified that Stober acted as though it was an accident.  (Tr. at 774).  H.Z. testified that she

then left, but later Stober messaged her saying he wished she would come back. (*Id*.) This contact led to filing of the GSI charge in Count 6 of the Indictment.

{¶24} H.Z. testified that her senior year the text messages from Stober were more than ever sexual, and that she continued to struggle with emotional problems, an eating disorder, depression, and suicidal thoughts. (Tr. at 777). H.Z. testified that she messaged Stober saying she was fat, and he said "prove to me you're fat." (Tr. at 780). H.Z. sent him a picture of a scale showing her weight. (*Id*.) In response, Stober called her down to his office and told H.Z. to lift up her shirt. (*Id*.) Stober then put his hand on H.Z.'s waist, and ran it along to her "bottom" and then "laughed it off like it was no big deal." (*Id*.) This contact was alleged to have occurred between August 2011 and October 2011, and led to the filing of the GSI charge in Count 7 of the Indictment.

{¶25} H.Z. testified that Stober drove her to a volleyball all-star game that H.Z. was playing in and Stober was coaching. (Tr. at 784). H.Z. testified that on the drive, Stober put his hand on her leg, squeezed it, and said they could go off into the woods. (Tr. at 787). H.Z. declined and they continued on to the game. (*Id*.) H.Z. testified that it was clear to her that Stober's intentions were sexual.

(*Id.*) This incident led to the filing of the Attempted Sexual Battery charge in Count 8 of the Indictment.[5]

{¶26} H.Z. testified that she was an office assistant at the Kalida High School during her free time, and that she eventually showed one of the messages Stober sent her to Nancy Grote, who worked in the office as a secretary. (Tr. at 796). H.Z. also confided in Amy Recker, a religion teacher, about the messages she was receiving from Stober. (Tr. at 793).

{¶27} H.Z. was told that more evidence was needed, so she took it upon herself to initiate text messages with Stober. (Tr. at 797). H.Z. testified that she knew Stober would turn the messaging sexual, and he did. (Tr. at 798-801). Amy Recker then showed the text messages to school authorities, made a transcript of them, and the school authorities contacted the police. (Tr. at 1067).

{¶28} The text "transcript" that was typed by Amy Recker was introduced into evidence, but no other text "content" was introduced into the record. (Tr. at 1069). Amy Recker testified that before H.Z. decided to text Stober, they attempted to obtain the records of prior text message content, but were told they could not get them. (Tr. at 1065). However, the State did introduce voluminous cell phone records of Stober, indicating that he had exchanged thousands of text

---

[5] Stober was acquitted of this charge.

messages with C.K. and H.Z over a period of months, as far back as the records could be traced.[6] The content of prior text messages could not be reproduced.

**{¶29}** In his case-in-chief, Stober called several witnesses who testified that they had never seen or witnessed Stober do anything inappropriate. Several of Stober's former volleyball players testified that Stober would say things like they looked nice, but they did not find the comments inappropriate or offensive. Throughout the trial, Stober's counsel painted the State's case as a "witch hunt."

**{¶30}** Stober also took the stand in his own defense. Stober admitted to texting his volleyball players, and admitted that he messaged H.Z. and C.K. (Tr. at 1250, 1343-1360). Stober testified that his messages with H.Z. began when she would watch Stober's house while he was on vacation. (Tr. at 1250). Stober testified that personal texts were exchanged between him and H.Z., as H.Z. disclosed things to him. (Tr. at 1252).

**{¶31}** Stober testified that he also helped coach baseball, and that a former baseball player of his committed suicide. (Tr. at 1253). Stober testified that the suicide "shook" him and that he "wasn't ever going to let that happen again." (Tr. at 1255).

---

[6] While the record reflected that thousands of text messages had been exchanged between Stober and C.K. and Stober and H.Z., Stober maintains on appeal that there were really only five or six text "conversations" per month between Stober and the girls, containing multiple "lines" of texts each, so that the actual number of texts exchanged was not in the thousands.

{¶32} Stober testified that H.Z. talked about suicide, and that he sent her many supportive messages. (Tr. at 1256-57). Stober testified that he tried to play a father figure role with H.Z. and that any sex-related talk came out of H.Z.'s questions. (Tr. at 1266). Stober testified that H.Z. was not truthful, and that he did not grab H.Z.'s butt or stomach. (Tr. at 1292-1293).

{¶33} Stober testified that alleged victim J.L. was a babysitter for his children when they were younger, and that J.L.'s family was close to his. (Tr. at 1279). He testified that he doesn't recall the "hug" J.L. described, and that he was initially happy when J.L. came back to Kalida as a teacher because he thought she could take over coaching volleyball one day. (Tr. at 1281-1285).

{¶34} Stober testified that alleged victim C.K. was lying, that he had never been to C.K.'s father's house, and that her allegations were untrue. (Tr. at 1289). Stober also testified that he did not squeeze C.K.'s butt or cause her to touch his penis. (*Id.* at 1289-90) Stober testified that C.K. was also lying about the masturbation video, saying that he made it and offered to send it to his mistress, Lori Fisher, who also testified at trial. (Tr. at 1273). Fisher testified on rebuttal that Stober never mentioned the masturbation video to her or sent it to her. (Tr. at 1404).

{¶35} Following the witnesses' testimony and the parties' closing arguments, the case was submitted to the jury. After deliberating, the jury

returned Not Guilty verdicts on Count 1, Tampering with Evidence, Count 2, Gross Sexual Imposition of J.L., and Count 8, Attempted Sexual Battery of H.Z. Stober was found Guilty of Count 3, Sexual Battery of C.K., Count 4, Gross Sexual Imposition of C.K., Count 5, Importuning of H.Z., and Counts 6 and 7, Gross Sexual Imposition of H.Z.

{¶36} On March 18, 2013, Stober's sentencing hearing was held.[7] The State recommended that Stober receive maximum prison sentences on each count to be served consecutively for an aggregate prison term of 10 and one-half years. Two of the victims who had testified at trial gave brief statements. Stober's counsel then made an argument in mitigation. Ultimately, the trial court sentenced Stober to maximum, consecutive sentences for each count, for an aggregate prison term of 10 and one-half years. A judgment entry memorializing Stober's sentence was filed March 28, 2013.

{¶37} It is from this judgment that Stober appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL PURSUANT TO U.S. CONST. AMEND. V, VI AND XIV AND OHIO CONST. ART. 1 § 10 WHEN THE TRIAL COURT DID NOT ORDER AN ACQUITTAL OF THE THREE GROSS SEXUAL IMPOSITION AND IMPORTUNING CHARGES AT THE CLOSE OF THE**

---

[7] Stober was also classified as a sex offender and notified of his duties under his classification at the hearing.

**STATE'S CASE AS THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT GAVE AN INCORRECT JURY INSTRUCTION THAT A LESSER SHOWING OF "FORCE" APPLIED AS AN ELEMENT TO THE GROSS SEXUAL IMPOSITION CHARGES WHICH DENIED THE DEFENDANT DUE PROCESS OF LAW AND A FAIR TRIAL PURSUANT TO U.S. CONST. AMEND. V, VI AND XIV AND OHIO CONST. ART. 1 § 10.**

**ASSIGNMENT OF ERROR 3**
**THE APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL PURSUANT TO U.S. CONST. AMEND. V, VI AND XIV AND OHIO CONST. ART. 1 § 10 AS HIS CONVICTIONS FOR SEXUAL BATTERY AND GROSS SEXUAL IMPOSITION (COUNT IV) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED.**

**ASSIGNMENT OF ERROR 4**
**THE APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL PURSUANT TO U.S. CONST. AMEND. V, VI AND XIV AND OHIO CONST. ART. 1 § 10 WHEN THE TRIAL COURT JOINED THE CHARGES AND DENIED HIS MOTION FOR RELIEF FROM PREJUDIDICIAL JOINDER.**

**ASSIGNMENT OF ERROR 5**
**THE APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL PURSUANT TO U.S. CONST. AMEND. V, VI AND XIV AND OHIO CONST. ART. 1 § 10 WHEN THE TRIAL COURT IMPROPERLY ALLOWED NUMEROUS 404(b) WITNESSES.**

**ASSIGNMENT OF ERROR 6**
**THE APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL PURSUANT TO U.S. CONST. AMEND. V, VI AND XIV AND OHIO CONST. ART. 1 § 10 WHEN THE PROSECUTOR ENGAGED IN MISCONDUCT DURING TRIAL AND IN HIS CLOSING STATEMENT AT TRIAL, WHICH CONDUCT SUBSTANTIALLY PREJUDICED THE APPELLANT AND MISLED THE JURY.**

**ASSIGNMENT OF ERROR 7**
**THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE APPELLANT'S TRIAL COUNSEL FAILED TO PROTECT APPELLANT'S RIGHTS AT TRIAL.**

**ASSIGNMENT OF ERROR 8**
**THE TRIAL COURT FAILED TO MAKE THE NECESSARY FINDINGS UNDER R.C. 2929.14(C) FOR THE IMPOSITION OF CONSECUTIVE SENTENCES AND FOR IMPOSING A MAXIMUM SENTENCE.**

**ASSIGNMENT OF ERROR 9**
**THE APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL AS THE ERRORS COMMITTED BY THE TRIAL COURT, THE PROSECUTOR, AND THE APPELLANT'S TRIAL COUNSEL COMBINED TO DENY THE APPELLANT A FAIR TRIAL.**

*First Assignment of Error*

**{¶38}** In Stober's first assignment of error, he argues that there was insufficient evidence to convict him for the three GSI charges and the Importuning charge. Specifically, with regard to the Importuning conviction, Stober contends that the State did not establish H.Z. was under 16 when she was receiving sexually solicitous messages from Stober. With regard to the GSI convictions concerning

-17-

C.K. and H.Z., Stober argues that the State's evidence as to the requisite element of "force" was insufficient.

**{¶39}** When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe,* 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 47, citing *State v. Jenks,* 61 Ohio St.3d 259 (1991), superseded by state constitutional amendment on other grounds as stated in *State v. Smith,* 80 Ohio St.3d 89 (1997). Sufficiency is a test of adequacy, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997).

### Sufficiency of the Evidence for Stober's Importuning Conviction (Count 5)

**{¶40}** In this case, Stober was convicted of Importuning in violation of R.C. 2907.07(B)(1), which reads, in pertinent part, as follows

> **(B)(1) No person shall solicit another, not the spouse of the offender, to engage in sexual conduct with the offender, when the offender is eighteen years of age or older and four or more years older than the other person, and the other person is thirteen years of age or older but less than sixteen years of age, whether or not the offender knows the age of the other person.**

**{¶41}** Stober argues on appeal that the testimony was not clear beyond a reasonable doubt that H.Z. was solicited prior to turning 16. In addition, Stober

also contends that it is not clear beyond a reasonable doubt that Stober ever solicited H.Z. to engage in sexual conduct.

**{¶42}** At trial, H.Z. gave the following testimony.

**Q [Prosecutor]: Was there ever a point when those text messages began getting sexual?**

**A [H.Z.]: Yes.**

**Q: And do you recall when that was?**

**A: It was sophomore year during volleyball season when I was dating my very first boyfriend.**

**Q: And while you were dating your very first boyfriend, the defendant would text you sexually?**

**A: Yes.**

**Q: And would that include what sort of references?**

**A: He basically would say that, you know, my boyfriend didn't deserve me; that he could do so much better; that guys in my grade were immature, and that he is a mature kind of guy; and he could show me what, you know, a true, like someone who – someone who is like me, like how I should be treated.**

**Q: And would he speak sexually to [you]?**

**A: He would ask me like about my sex life and if, you know, if I have done anything with him; and he would sometimes make comments saying, well, let me know when this happens; let me know, you know, when you do this for the first time.**

**Q: Did he ever make any comments via text messaging about using his fingers on you?**

**A:**   **Yes.**

**Q:**   **And was that all of your sophomore year?**

**A:**   **Yes.**

**Q:**   **And would he make any references to you performing oral sex on him?**

**A:**   **That was not until junior year.**

**Q:**   **So your sophomore year in the fall, there were references to him penetrating you with his fingers?**

**A:**   **Yes.**

**Q:**   **When is your birthday?**

**A:**   **January 16th.**

**Q:**   **What Year?**

**A:**   **1994.**

**Q:**   **And would that make you 15?**

**A:**   **Yes.**

**Q:**   **Your Sophomore year?**

**A:**   **Yes.**

**Q:**   **And that's when you were receiving these text messages?**

**A:**   **Yes.**

(Tr. at 758-759).

{¶43} On cross-examination, H.Z. was further questioned about these text messages.

> **Q[Stober's Counsel]: Okay. Okay. Now, when you say he would talk to you about using his fingers and things of that nature, was he telling you basically how things might happen sexually?**
>
> **A [H.Z.]: No. He said that he would use his fingers, not somebody could use theirs. It was he using his.**
>
> **Q: On who?**
>
> **A: On me.**
>
> **Q: Okay. And this was your sophomore year?**
>
> **A: This was my sophomore year.**
>
> **Q: And what was your response to that?**
>
> **A: I didn't really have a response. I mean, sometimes when he – he said it more than once. There were times where I would say, coach, you have a family, you have a wife. Other times I would just let it go and say, ha ha, or, yeah, I guess, guess so.**

(Tr. at 830-831).

{¶44} Based on the foregoing testimony, we find that there was sufficient testimony presented for a jury to have determined beyond a reasonable doubt that Stober solicited sexual contact from H.Z. before she turned 16. H.Z. was specifically asked if Stober's conversations regarding "using his fingers" on her occurred while she was 15 and she said that they did. Under these circumstances,

viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could find all of the elements of Importuning proven beyond a reasonable doubt.

**Sufficiency of the Evidence for Stober's GSI Convictions**

{¶45} Stober was also convicted of three counts of GSI in violation of R.C. 2907.05(A)(1), which reads as follows.

> **(A)  No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:**
>
> **(1)  The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.**

{¶46} "Force," for the purposes of GSI, is defined in R.C. 2901.01, as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."  In order to prove force, the State "need not prove physical resistance to the offender" in prosecutions for GSI.  R.C. 2907.05(D).

{¶47} The Ohio Supreme Court has addressed the issue of "force" or "threat of force" in multiple cases.  In *State v. Eskridge*, 38 Ohio St.3d 56 (1988), the Ohio Supreme Court held,

> **[t]he force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other.  With the filial obligation of obedience to a parent, the same degree of force and violence may not be**

-22-

> **required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength.**

*Eskridge*, at paragraph one of the syllabus citing *State v. Labus*, 102 Ohio St. 26, 38–39, (1921).

{¶48} The Court in *Eskridge* continued, stating that given the "coercion inherent in parental authority" when a parent abuses his or her child, the requisite force "'need not be overt and physically brutal, *but can be subtle and psychological*. As long as it can be shown that the * * * victim's will was overcome by fear or duress, the forcible element * * * can be established.'" (Emphasis added.) *Id.* at 58–59, quoting *State v. Fowler*, 27 Ohio App.3d 149, 154, (8th Dist.1985).

{¶49} In *State v. Dye*, 82 Ohio St.3d 323 (1998), the Ohio Supreme Court further held that the lesser showing of force principles established in *Eskridge* also applied to situations where a parent-child relationship was absent, but the adult defendant stood in a position of authority over the child-victim. *State v. Dew*, 7th Dist. Mahoning No. 08 MA 62, 2009-Ohio-6537, ¶ 106, citing *Dye* at 55. In such a case, the Court found that force or threat of force could be met "without evidence of express threat of harm or evidence of significant physical restraint." *Id.*

**{¶50}** In interpreting this line of Ohio Supreme Court cases, and the appellate cases following them, the Seventh District Court of Appeals held in *State v. Dew*, 7th Dist. Mahoning No. 08 MA 62, 2009-Ohio-6537, that force, for the purposes of Rape and GSI, is

> **"a relative term that depends on the totality of the circumstances in a certain case."** *State v. Rupp,* **7th Dist. No. 05MA166, 2007–Ohio–1561, at ¶ 49. Although the case law holds that a somewhat lesser showing of force is required when the defendant stands in a position of authority over the victim, the focus of the inquiry is** *whether the victim's will was overcome by fear or duress*. **See, e.g.,** *Eskridge* **at 58–59, 526 N.E.2d 304.**

(Emphasis added.) *Dew* at ¶ 111.

**{¶51}** The Ohio Supreme Court has held that

> **"in determining whether a course of conduct results in duress, the question is not what effect such conduct would have upon an ordinary man but rather the effect upon the particular person toward whom such conduct is directed, and in determining such effect the age, sex, health and mental condition of the person affected, the relationship of the parties and all the surrounding circumstances may be considered."**

*State v. Getsy*, 84 Ohio St.3d 180, 206 (1998), quoting *Tallmadge v. Robinson*, 158 Ohio St. 333 (1952).

**{¶52}** With these standards in mind, we turn to the evidence presented regarding each of the GSI convictions.

**GSI of C.K. (Count 4)**

{¶53} Stober was convicted of one count of GSI with respect to C.K. At trial, testimony was presented that C.K. was a student at Kalida wherein Stober was a teacher and the technology coordinator. Although C.K. did not play volleyball for Stober and did not take any of Stober's classes, Stober did provide presentations to C.K. and her classmates in the classroom. Stober also implied through his testimony at trial that he viewed his relationship with C.K. as a teacher-student relationship.

> **Q: So again, you're being a good person in trying to help out a student [C.K.]?**
>
> **A: That's what teachers do.**

(Tr. at 1343). This evidence would establish that Stober was, in fact, an authority figure to C.K.

{¶54} Regarding the incident that led to this specific charge, C.K. testified that at the end of her junior year of high school, she had to print an assignment while in school.[8] (Tr. at 592). She testified that she tried to print the assignment on the "art computer" but was unable to do so. (*Id.*) C.K. then attempted to print

---

[8] We would note that there was initially a discrepancy in C.K.'s testimony as to the timeframe when this incident happened. C.K. initially testified it was after June 2010, which would have been in her senior year of high school. However, later on cross-examination, C.K. corrected her earlier statement, clarifying multiple times consistently that it was the end of her junior year of high school, prior to June 2010. Ultimately, at the close of evidence, the State moved to amend Count 4 of the Indictment to include dates back to March, 2010, which would have covered the end of C.K.'s junior year, and comported with her testimony. (Tr. at 1380). That amendment was granted. (*Id.*)

the assignment in the library, and was again unable to do so. (*Id.*) The art teacher then directed C.K. to go to Stober to see if he could figure it out. (*Id.* at 593).

**{¶55}** C.K. testified that she went into Stober's office, opened up the file and attempted to print it. (Tr. at 594). She testified that it was just the two of them in Stober's office at the time, and that when she "stood up and turned around, he then grabbed [her] hand and put it on his penis." (Tr. at 594). C.K. testified that it was not voluntary, it happened quickly, and that she pulled her hand away. (Tr. at 566).

**{¶56}** The action described by C.K. has been found to be sufficient to support a GSI conviction. In *State v. Steele*, 5th Dist. No. 2011-CA-110, 2012-Ohio-3777, the Fifth District Court of appeals held that testimony of a victim that a defendant "grabbed her hand and pulled it over to his penis" constituted sufficient evidence for a reasonable person to conclude beyond a reasonable doubt that a GSI had been committed. *Steele* at ¶¶ 53-56.

**{¶57}** Nevertheless, this is not the only incident mentioned in C.K.'s testimony leading to the filing of Count 4 in the indictment. C.K. also testified that on the day her senior class photo was taken, she was again alone with Stober in Stober's office and he "grabbed [her] butt." (Tr. at 565). C.K. testified that when Stober "grabbed [her] butt," he was "[m]oaning and grumbling like he liked it." (Tr. at 546).

{¶58} C.K. testified at one point that Stober told her "not to tell anyone." (Tr. at 567). However, it is unclear from the transcript whether this was in reference to the sexual text messages, the incidents leading to the GSI charge, the incident leading to the sexual battery charge, or in reference to a specific line of questioning wherein C.K. testified that Stober sent her messages that he masturbated in the bathroom while thinking of her. (Tr. at 566-567).

{¶59} C.K. testified that in her senior year she told her guidance counselor that Stober was sending her text messages, but not the content of the messages. (Tr. at 559). She also testified that she told a man named Jeff Burke, who she looked at like a "father figure" about the fact that Stober was sending her text messages. (Tr. at 558). C.K. told Burke that the messages made her uncomfortable. (*Id.*)

{¶60} Burke testified that in the spring of C.K.'s junior year, C.K. confided in him that she was getting text messages and candy from Stober. (Tr. at 670). Burke testified that C.K. "didn't appreciate" receiving the messages from Stober. (*Id.* at 671). He testified, however, that C.K. asked him to keep it confidential, so he did. (*Id.*)

{¶61} C.K. testified that she did not report the sexual contact initially, "[b]ecause after I had told the guidance counselor that [Stober] was texting me, nothing, it wasn't investigated, nothing was done about it, so I thought that nobody

really cared." (Tr. at 604). C.K. also testified that later, when being interviewed by the police, she was reluctant to disclose everything because she believed people would blame her. (Tr. at 647). She also testified that she told investigating officers that she felt she should have said no because she knew better. (Tr. at 647).

{¶62} Based on the testimony and the totality of the circumstances, we find that there was sufficient evidence to convict Stober of GSI of C.K. Force was present during the incident where Stober caused C.K. to touch his penis. In addition, there was evidence presented from which a jury could reasonably conclude that C.K. was under a measure of duress, or compulsion, preventing her from revealing these incidents or resisting them, all of which is sufficient to allow a jury to reasonably infer the presence of force as outlined above where the perpetrator is an authority figure.

**GSIs of H.Z. (Counts 6 and 7)**

{¶63} Stober was convicted of two counts of GSI of victim H.Z. H.Z. was a student in Stober's classes, she played on Stober's volleyball team from her sophomore through her senior year of high school, and she was also Stober's neighbor. In addition, Stober testified that he played a father-figure role with H.Z. (Tr. at 1264-1265).

**{¶64}** As stated above, Stober began sending H.Z. text messages as early as her seventh grade year, but the messages were originally about volleyball and did not turn "sexual" in nature until her sophomore year. H.Z. testified that the messages, including the sexual messages, continued into her junior and senior years of high school. H.Z. testified that she was struggling with emotional problems, an eating disorder, depression, and suicidal thoughts. H.Z. testified that she confided this to Stober. (Tr. at 778). H.Z. testified that occasionally her conversations with Stober concerned her eating disorder. (*Id.* at 780).

**{¶65}** H.Z. testified that she worked as an office aide in the high school along with Carol Kahle, and Nancy Grote, who were high school secretaries. (Tr. at 779). H.Z. testified that Stober would often call her down to his office in the school. (Tr. at 779). Nancy Grote testified that when Stober would call H.Z. down to his office, her demeanor would change. (Tr. at 719-720). Grote testified that prior to being called down to Stober's office, H.Z. would be "chatty" and "happy." (Tr. at 720). Grote testified that when H.Z. returned from going to Stober's office, she would be "quieter" and in one instance, "put her head down." (*Id.*) Grote testified that it bothered her and Kahle, the other secretary. (*Id.*) Grote testified that after making these observations, she made an attempt to help H.Z. avoid going down to Stober's office. (Tr. at 721). Grote testified that she would send H.Z. on errands so that she did not have to go down to Stober's office.

(*Id.*) Grote testified that, especially once volleyball season was over, H.Z. did not need to go down to Stober's office, yet H.Z. would state that she had to go, so she would go. (Tr. at 721). These facts, along with Stober's position as teacher and coach of H.Z., and Stober's comments about being a father figure to H.Z., are sufficient to support Stober being an authority figure to H.Z.

{¶66} H.Z. testified that the first incident leading to a GSI charge in the indictment occurred in the summer after her junior year, in June of 2011. Regarding this incident, H.Z. testified as follows.

> **That was when I had a volleyball camp form that was to be turned in, and it was turned in late, and I had to go over to his house to bring it to him; and I was getting ready to go over to a friend's house to go lay out and tan, so I had a swim suit on and silky shorts and a cutoff.**
>
> **And he came up to my window to get it, and he was also in his swimsuit. I rolled my window down, and he – I held the paper out; but he kind of reached in like acting as if the paper was in there, and he grabbed my breast.**
>
> **\* \* \***
>
> **Q: Did you stay at the residence or the driveway?**
>
> **A: Until like he took his hand away and he kind of said, oops, acting like he didn't mean to do it, but I knew that he actually did intend to. And then I just proceeded to say, all right, I've got to go, I'm going to Jill's house, and I left.**

(Tr. at 773-774). H.Z. testified that later that day she received text messages from Stober wherein Stober stated he wished that H.Z. "would have came back and

skipped going to Jill's house." (Tr. at 774). Stober informed H.Z. that no one was home at his residence at the time. (*Id*. at 775).

{¶67} Regarding the second incident leading to a GSI charge in the indictment, H.Z. testified that her senior year the text messages from Stober were more sexual than ever. H.Z. testified to the following incident during the fall of her senior year, during volleyball season. (Tr. at 781).

> **He would always text me saying, prove to me that you're fat. One time I stood on a scale, sent a picture of the weight on the scale to him. That wasn't good enough. I went down to his office one day, and he proceeded to ask me to lift my shirt up so that he could see my stomach. And then he reached out and grabbed it and touched it and moved his hand down to my bottom and kind of laughed it off like it was no big deal.**

(Tr. at 780). H.Z. testified that she did not think it was innocent. (*Id*.)

{¶68} H.Z. testified that volleyball was a positive thing in her life, and she thought if she told her parents about Stober's actions her sophomore, junior, or senior years they would not have let her play volleyball. (Tr. at 789). H.Z. testified that volleyball was worth it to her to not jeopardize by disclosing Stober's actions. (*Id*.)

{¶69} In addition, H.Z. testified that she had other reservations about initially disclosing the text messages and the physical contact from the incidents. She testified,

> **Two main [reasons] that come to my head would be that I would have been benched on the court or that he would have played one of his mind games with me like trying to get into my head and then, you know, I would have a bad game so he would have a reason to bench me.**
>
> **Also, I, I hate being a person who would cause any problems in someone else's family if I did not have to, and I did not want that to happen between him and his family and to have his kids have to suffer going through a divorce, two parents going, you know, where the dad – especially since I was in school and his oldest son was also in school, like same school that I was. I would have felt terrible if I would have been the person to break up his parents.**

(Tr. at 789-790).

{¶70} In sum, Stober was an authority figure as teacher and as a coach of H.Z. in volleyball. Stober's authority as H.Z.'s coach was part of the reason H.Z. testified that she was unable to resist or report Stober's actions earlier than she did. H.Z. also suffered from mental/emotional issues, and Stober was aware of and took advantage of these conditions. Stober's degree of control over H.Z was such that she felt compelled to show up when Stober messaged her to report to his office, as corroborated by the testimony from the secretaries that H.Z. did not want to go, and that going to Stober's office clearly affected her mental state and demeanor. In addition, like C.K., it is apparent that H.Z. feared revealing or resisting these incidents for multiple reasons. All of this evidence was clearly

sufficient to establish duress and compulsion in the context of an authority figure, which augments the physical force used to commit the GSIs against H.Z.

{¶71} Based on the entirety of the evidence and the totality of the circumstances, we find that there was sufficient evidence in this case for the jury to find beyond a reasonable doubt that Stober committed GSIs as alleged in Counts 6, and 7. Accordingly, Stober's first assignment of error is overruled.

*Second Assignment of Error*

{¶72} In Stober's second assignment of error, he argues that the trial court erred when it instructed the jury on "a lesser showing of force" that applies in a coach/teacher relationship.

{¶73} At the outset, we would note that no objection was raised at the trial on this issue, therefore, Stober has waived all but plain error. *State v. Bustamante*, 3d Dist. Seneca No. 13-12-26, 2013-Ohio-4975, ¶ 15. In order to have plain error under Crim.R. 52(B) there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error must have affected "substantial rights." *State v. Barnes,* 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.* quoting *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶74} In this case, the trial court gave the following instruction on "Force."

> **Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing.**
>
> **When the relationship between the victim and the Defendant is one of child and coach, or teacher, the element of force need not be openly displayed or physically brutal. It can be slight or psychological. Evidence of an expressed threat of harm, or evidence of significant physical restraint is not required. If you find that beyond a reasonable doubt that under the circumstances in evidence, the victim's will was overcome by fear or duress, the element of force has been proved.**

(Tr. at 1455).

{¶75} Despite Stober's arguments, the trial court's jury instructions were taken directly from the Ohio Jury Instructions and adequately reflect the law as summarized in the preceding assignment of error regarding "force" when an authority figure is present. Therefore, we cannot find error, let alone plain error. Accordingly, Stober's assignment of error is overruled.

*Third Assignment of Error*

{¶76} In Stober's third assignment of error, he argues that Stober's convictions for Sexual Battery and GSI concerning C.K. were against the manifest weight of the evidence. Specifically, Stober argues that C.K.'s testimony regarding the Sexual Battery and GSI incidents was vague and unbelievable, and that given C.K.'s age at the time of the offense, she would have remembered more detail.

**{¶77}** The Ohio Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, ¶ 10, quoting *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

**{¶78}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Volkman, supra,* at ¶ 12; *Thompkins*, *supra*, at 387. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Thompkins* at 387. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

**{¶79}** Stober argues that his convictions for Sexual Battery and GSI of victim C.K. were against the manifest weight of the evidence. GSI in violation of R.C. 2907.05(A)(1) has been defined previously. Sexual Battery is defined in R.C. 2907.03, and reads, in pertinent part, as follows.

**(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:**

**\* \* \***

**(7) The offender is a teacher, administrator, coach, or other person in authority employed by or serving in a school for which the state board of education prescribes minimum standards pursuant to division (D) of section 3301.07 of the Revised Code, the other person is enrolled in or attends that school, and the offender is not enrolled in and does not attend that school.**

### Sexual Battery

**{¶80}** In this case, Stober contends that C.K. was 20 years old at the time of trial and "[y]et, her testimony was vague and incredible in regard to salient details that persons exposed to sexual acts would know."  (Appt.'s Br. 14).

**{¶81}** At trial, C.K. testified that approximately a week before the alleged sexual intercourse took place, Stober began asking C.K. about her parents' schedule.  (Tr. at 547).  According to C.K., her father, who she lived with, worked third shift.  (Tr. at 548).  C.K. testified that in June of 2010, "about a week" after she had given Stober her father's work schedule, Stober showed up at her residence at approximately 4 a.m.  (Tr. at 550).

**{¶82}** C.K. testified she was sleeping on her living room couch and was awakened by knocking at the door.  (Tr. at 550).  She testified that she went to the door, and looked outside, and saw Stober "standing in the corner [of her porch] with his bike."  (Tr. at 551).  C.K. testified that Stober was wearing a "T-shirt and

-36-

shorts." (Tr. at 551). C.K. later clarified on cross-examination that Stober was wearing "khaki or jean" shorts because they were not "mesh soft shorts" and that his shorts had a "Zipper and snap/button." (Tr. at 601).

{¶83} C.K. testified that, "I opened the door, and I peeked my head around the corner; and I seen him, and I froze. And he had stepped forward into the house, pushing me backwards down onto the couch. Then he started feeling up my shirt and down my shorts, was kissing me. Proceeded to take my shorts off, stuck his fingers inside me and then his penis." (Tr. at 551-552).

{¶84} C.K. clarified on cross-examination that when she said that Stober pushed her backwards she meant pushing "as in a way of forcing, I guess, without touching me. He was close to me, backing me, walking towards me, and I'm backing up backwards." (Tr. at 607-608). C.K. testified that "[Stober] pretty much pinned [her] until [she] * * * was down on the couch." (Tr. at 608). C.K. testified that because Stober had backed her up so she "couldn't do anything" she felt as though Stober had pushed her. (Tr. at 609). C.K. testified that she was "too scared" to tell Stober "no." (Tr. at 552).

{¶85} C.K. also testified that she tried "[s]cooting out from under" Stober, but that she did not push him away forcefully. (Tr. at 627). C.K. further testified that though she did not forcefully try to get up, "in [her] head [she] * * * wanted to

get up." (Tr. at 627). C.K. testified that after Stober was finished he pulled up his shorts and walked out of the door, without any conversation. (Tr. at 553).

{¶86} Of this incident, Stober simply testified that he did not have sex with C.K., and that he had never been to C.K.'s father's residence.

{¶87} On appeal, Stober argues that C.K.'s testimony regarding the incident of sexual intercourse leading to the Sexual Battery conviction was not credible because C.K. "could not remember" whether Stober wore a condom, or whether Stober ejaculated inside her. Stober also contends that C.K.'s claim that no words were spoken at the time of the incident was not credible.

{¶88} Despite Stober's characterizations on appeal, C.K. specifically testified that Stober "did not" wear a condom and she knew because Stober "didn't put anything on." (Tr. at 553). She also testified that she "assume[d]" Stober ejaculated inside of her. (Tr. at 553). C.K. testified specifically that she had "tried blocking that day out [of her memory] as much as [she] can." (Tr. at 632). Nevertheless, C.K. gave testimony that was consistent on direct and cross-examination regarding this incident. In addition, the jury was fully able to see and hear her testimony, as well as Stober's denial of the incident, and weigh the credibility of these witnesses. The jury was free to find Stober's denials to be disingenuous, and/or otherwise evaluate Stober's testimony. Under these facts and circumstances, we cannot find that the jury clearly lost its way on this issue.

**GSI**

{¶89} Stober also argues that his conviction for GSI related to C.K. was against the manifest weight of the evidence. Stober argues that because C.K. could not remember whether Stober's penis was erect, her testimony was not credible. However, C.K. testified that her back was turned when Stober pulled out his penis. (Tr. at 595). C.K. testified that when she turned back toward Stober, Stober grabbed her hand and put it on his penis. (Tr. at 595). C.K. testified that she jerked her hand away, grabbed her "thumb drive" and walked out. (Tr. at 595). C.K. also testified to the incident wherein Stober "grabbed" her butt and moaned while doing so.

{¶90} In contravention of C.K.'s testimony, Stober claimed that the incidents did not happen. (Tr. at 1289).

{¶91} The GSI conviction turned on the credibility of C.K.'s testimony and the credibility of Stober's denial at trial. The jury was in a far better position to make a credibility determination on these issues than the appellate court is, and we cannot find that under these circumstances, the jury clearly lost its way or that there was a "manifest miscarriage of justice." Accordingly, Stober's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶92}** In Stober's fourth assignment of error, he argues that the trial court erred in denying Stober's motion to sever the counts against the various alleged victims into separate trials.

**{¶93}** The joinder of offenses is governed by Crim.R. 8(A) which provides:

**Two or more offenses may be charged in the same indictment * * * if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.**

**{¶94}** "'It is well-established that the law favors joinder because the avoidance of multiple trials conserves time and expense and minimizes the potentially incongruous outcomes that can result from successive trials before different juries.'" *State v. Howard*, 2d Dist. Greene No. 2012-CA-39, 2013-Ohio-2343, ¶ 35, quoting *State v. Glass,* 2d Dist. Greene No. 2000-CA-74, 2001 WL 228453, *2 (Mar. 9, 2001), citing *State v. Schiebel,* 55 Ohio St.3d 71, 86–87 (1990). (Other citations omitted.).

**{¶95}** A defendant can move to sever joined offenses pursuant to Crim.R.14, which states that, "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * the court shall order an election or separate trial of

counts, grant a severance of defendants or provide such other relief as justice requires."

**{¶96}** "The defendant claiming error in the trial court's refusal to sever multiple charges has the burden of affirmatively showing that his rights were prejudiced." (Citations omitted.) *State v. Skatzes,* 2d Dist. Montgomery No. 15848, 2003–Ohio–516, ¶ 147. "To affirmatively show that his rights have been prejudiced, the defendant 'must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and [the defendant] must demonstrate that the court abused its discretion in refusing to separate the charges for trial.'" *Glass, supra*, at *3–4, quoting *State v. Lott,* 51 Ohio St.3d 160, 163 (1990). (Other citation omitted.)

**{¶97}** "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *State v. Thomas*, 3d Dist. Allen No. 1-11-25, 2012-Ohio-5577, ¶ 21 citing *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992). If the evidence of other crimes would be admissible at separate trials, any "prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials," and a

court need not inquire further. *Id,* quoting *Drew v. United States*, 331 F.2d 85, 90 (1964).

{¶98} Moreover, "a defendant is not prejudiced by joinder where the joined offenses are 'simple and direct, so that a jury is capable of segregating the proof required for each offense.'" *State v. Wilson,* 2d Dist. Montgomery No. 20910, 2005–Ohio–6666, ¶ 38, quoting *State v. Fletcher,* 2d Dist. Clark No. 2003–CA–62, 2004–Ohio–4517, ¶ 41.

{¶99} We review a trial court's decision on joinder of offenses for trial under an abuse of discretion standard. *State v. Banks,* 10th Dist. Franklin No. 09AP–1087, 2010–Ohio–5714, ¶ 30, citing *State v. LaMar,* 95 Ohio St.3d 181, 767 N.E.2d 166, 2002–Ohio–2128. "The term 'abuse of discretion' connotes more than a mere error in law or judgment; it implies that the court's attitude was unreasonable, arbitrary or unconscionable." *Id.,* quoting *State v. Adams,* 62 Ohio St.2d 151, 157 (1980).

{¶100} In this case, Stober made a motion for relief from prejudicial joinder prior to trial, and this motion was denied. Stober renewed his motion at trial multiple times, and was denied each time.

{¶101} The jury in this case acquitted Stober of multiple counts, including counts related to separate victims. The jury acquitted Stober of his only charge against J.L., acquitted Stober of the charge of Attempted Sexual Battery against

H.Z., and then also acquitted Stober of the charge of Tampering with Evidence. In the Tampering with Evidence charge, it was alleged as part of the crime that Stober instructed C.K. and H.Z. to delete text messages. Thus Stober was, in effect, acquitted of some accusations related to each alleged victim, showing that the evidence was simple and direct and that the jury was able to segregate proof for each offense. Under these circumstances, we fail to see how Stober is able to establish any prejudice considering the jury was clearly able to discern the separate crimes and did not appear to be biased by the testimony from the other incidents.

{¶102} Moreover, the testimony of the other victims could have been admissible in each other's trials under Evid.R. 404(B) to show motive, intent, plan, or scheme. As the evidence could have been admissible in separate trials, we again cannot find that the trial court erred.

{¶103} Accordingly, Stober's fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶104} In Stober's fifth assignment of error, he argues that the trial court improperly allowed witnesses to testify in contravention of Evid.R. 404(B). Specifically, Stober argues that the trial court improperly allowed the testimony of five witnesses in this case. Stober contends that these witnesses of the State

testified to "bad acts" testimony that violated both Evid.R. 404(B) and the Rape

Shield Statute.

{¶105} Evid.R. 404(B), reads as follows.

> **Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.**

{¶106} "Generally, the prosecution in a criminal case may not present evidence that the defendant has committed other crimes or acts independent of the crime for which the defendant is being tried to establish that the defendant acted in conformity with his bad character." *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 20, citing Evid.R. 404(B); *State v. Brown,* 1st Dist. Hamilton No. C–120327, 2013–Ohio–2720, ¶ 26. However, Evid.R. 404(B) provides that other bad acts are admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Shedrick,* 61 Ohio St.3d 331, 337 (1991); *Brown* at ¶ 26. This list is non-exclusive. *State v. Morris,* 132 Ohio St.3d 337, 2012–Ohio–2407, ¶ 18.

**{¶107}** The Ohio Supreme Court held in *State v. Williams,* 134 Ohio St.3d 521, 526, 2012–Ohio–5695, that the admission of other acts evidence is a three-step process. *Williams*, at ¶ 22; *State v. Guerra*, 9th Dist. Lorain No. 12CA010188, 2013-Ohio-5367, ¶ 17.

> **The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.**

*Williams* at ¶ 20.

**{¶108}** "Evidentiary rulings at trial are reviewed on appeal for an abuse of discretion." *State v. Altman*, 7th Dist. Columbiana No. 12 CO 42, 2013-Ohio-5883, ¶ 22, citing *State v. Beshara,* 7th Dist. Mahoning No. 07 MA 37, 2009–Ohio–6529, ¶ 55, citing *State v. Bey,* 85 Ohio St.3d 487, 490 (1999). However, at trial Stober did not object to any of these witnesses, and has waived the issue on appeal absent plain error. Crim.R. 52(B).

**{¶109}** In addition, we would note that under the invited error doctrine, "a party is not entitled to take advantage of an error that he himself invited or

induced." *State ex rel. Kline v. Carroll,* 96 Ohio St.3d 404, 2002-Ohio-4849; *State v. Smith,* 8th Dist. Cuyahoga No. 79936, 2002-Ohio-3114, at ¶ 30.

{¶110} On appeal, Stober argues that the testimony of five of the State's witnesses was inadmissible at trial under Evid.R. 404(B). We will address each in turn.

**Lori Fisher**

{¶111} First, Stober argues that Lori Fisher's testimony was impermissible under 404(B) and the Rape Shield Statute. Stober contends that Fisher's testimony did not concern evidence of pregnancy, semen, or disease and therefore was not permissible.

{¶112} Fisher testified that she was a teacher at Kalida, and *on cross-examination* she testified that she had been having an ongoing affair with Stober for over a decade. The State elicited testimony from Fisher about text messages that she exchanged with Stober, which were within minutes of text messages Stober exchanged with H.Z. and C.K. The State offered this evidence to show that it must have been Stober that was in possession of his phone at the time these messages were sent.

{¶113} In addition, Fisher offered testimony that Stober had told her he could no longer have children, which was similar to a message C.K. said she had received from Stober. (Tr. at 675).

{¶114} Prior to Fisher's testimony, Stober's counsel specifically stated that he did not intend to object to Fisher as a 404(B) witness. On cross-examination, Stober's counsel drew out the fact that Fisher thought Stober was a good listener, that he was caring, and that she made the first advance on him. (Tr. at 690). Fisher also testified on cross, when prompted by Stober's attorney, that Stober was always "worried about his ability to please. [Stober] made references that he would like to have been able to take a male enhancement pill, but didn't know how he could take it without his wife finding out." (Tr. at 692). Stober's counsel used this testimony to contradict the testimony of H.Z. and C.K. C.K. testified she received a text message from Stober wherein Stober stated "he would be so big he would tear [C.K.] up." (Tr. at 545). H.Z. later testified that she received a message from Stober wherein Stober stated "he was so big he could tear [her]." (Tr. at 791).

{¶115} Moreover, it became clear later when Stober took the stand and testified that he had made the "masturbation" video for Fisher, that Stober's counsel brought in the information regarding their affair to attempt to support that claim.

{¶116} Thus not only did the State have legitimate purposes for calling Fisher, but Stober's counsel had legitimate reasons for wanting her testimony to be

entered into evidence. Under these circumstances, we cannot find that there was any error, let alone plain error in allowing her testimony.

**Jenna Missler**

{¶117} Stober next argues that the testimony of Jenna Missler was improper under Evid.R. 404(B). Stober argues that Missler was an adult teacher, and not a student, and thus her testimony was unrelated to the testimony of the younger, student victims.

{¶118} Missler gave testimony that she was a Spanish teacher at Kalida and that she received instant messages from Stober. (Tr. at 484). Missler testified that the messages began about work, but then became more personal. (Tr. at 484). Those messages contained Stober's use of a "smiley face," which she described as a characteristic of Stober's messaging. Missler testified that the comments eventually crossed the line with her and that she spoke to the sexual harassment coordinator about the messages Stober had sent her. The messages were entered into evidence as an exhibit. (State's Ex. 20).

{¶119} On cross-examination, Stober's counsel went through the alleged harassing messages from Stober. The messages begin by showing Stober as helpful, and supportive. (State's Ex. 20). They also show Stober being helpful to Missler with her problems at school. (*Id.*) The messages which Missler stated

"crossed the line" were when Stober said "and may I add your husband must be one lucky man…. :)," and "because you seem to look amazing in just about everything…. that dress yesterday was extremely nice…. :)." (*Id*.) Stober's counsel made it clear that those messages were the extent of Stober's "inappropriate" comments to Missler. As the remainder of the conversation between Stober and Missler showed Stober being helpful to Missler, this testimony furthered Stober's counsel's trial strategy of painting the prosecution of Stober as a "witch hunt."

{¶120} Missler's testimony may have had less of a connection to any of the indicted charges than any of the other non-victim witnesses. Nevertheless, the State had *some* legitimate basis for introducing Missler's testimony, and Stober's counsel also cross-examined Missler in a manner that was consistent with, and even furthered, his trial strategy. Accordingly, we cannot find any error in allowing this testimony. However, even if there was error, trial counsel's cross-examination of Missler certainly minimized any potential claim of prejudice and we thus cannot find any reversible error in permitting this witness to testify.

**Mary Lynn Kahle**

{¶121} Stober next argues that Mary Lynn Kahle's testimony was impermissible under Evid.R. 404(B). Kahle testified that she was a volleyball player for Stober, that Stober added her on ICQ chat, and engaged her in

conversations, which eventually turned personal. (Tr. at 342-343). Stober told Kahle that he could see himself in a relationship with her. (Tr. at 344). On cross-examination Stober's counsel elicited testimony that Stober never tried to physically touch Kahle, furthering his argument that the State was conducting a witch hunt, and that the State was trying to liken the case to "Jerry Sandusky" when the evidence did not support such a comparison. (Tr. at 353); (Tr. at 292).

**{¶122}** Moreover, we must note that this testimony, while remote in time to the charges involving victims C.K. and H.Z., carried a much closer proximity and similarity to the indicted charge involving victim J.L. in 2001. As there is some basis for allowing the testimony, and it was clearly used and not objected to as part of Stober's counsel's trial strategy, we cannot find that there was error here, let alone plain error.

**Karen Fortman**

**{¶123}** Stober next contends that the testimony of Karen Fortman was impermissible under Evid.R. 404(B). Fortman testified that in 1995 she was a student in Stober's classes, and that Stober made a "spectacle" out of her. Fortman testified that she then asked to be removed from Stober's class in the future. Fortman testified that Stober subsequently called her into his office, shut the door, and told her that when he looked at her, he saw someone he would like to

be married to.  On cross-examination, Fortman admitted that there was no sexual contact between her and Stober.

{¶124} The State again argues that this testimony was permissible to show Stober's motive, intent, scheme, plan, or preparation in using his position in the school to target these girls for sexual advances.

{¶125} Again, while remote in time to the incidents with C.K. and H.Z., there is a similarity in Stober's approach to all three victims and a proximity in time to the charge involving J.L.  As there is some basis for allowing the testimony, and it was again clearly used as part of Stober's counsel's trial strategy, we cannot find that there was error here, let alone plain error.

## J.L.

{¶126} Lastly, Stober argues that some of J.L.'s testimony was impermissible at trial.  The testimony Stober finds objectionable is when J.L. testified that while working as a substitute, Stober came into her room and asked J.L. "weren't you going to wait for me?"  (Tr. at 373).

{¶127} The State maintains that this testimony was permissible to help retroactively corroborate and confirm J.L's allegation that Stober had a "sexual" interest in J.L. when he had contact with her as a student several years earlier, which led to the filing of the GSI charge in Count 2.  We agree.  Thus the State had some legitimate basis for introducing this evidence.

-51-

{¶128} Nevertheless, even if the testimony was impermissible, Stober is unable to establish any prejudice, as Stober was acquitted of the count relating to J.L., showing that the jury was not biased by this evidence.

{¶129} Accordingly, as we have not found any prejudicial error in the testimony of these witnesses, Stober's fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶130} In Stober's sixth assignment of error, he argues that the prosecutor committed misconduct during the trial. Specifically, Stober contends that the prosecutor repeatedly expressed his opinion that Stober was a liar during closing arguments, that the prosecutor urged jurors to put themselves in the place of the alleged victims, that the prosecutor sought to evoke sympathy for the victims, that the prosecutor elicited testimony as to whether they believed various witnesses, and that the prosecutor improperly informed the jury on the element of force.

{¶131} In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. *State v. Jones*, 90 Ohio St.3d 403, 420 (2000). "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v.*

*Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.* (Citation omitted).

**{¶132}** Prosecutorial misconduct is generally not grounds for reversal unless it so taints the proceedings as to deprive the defendant of a fair trial. *State v. Johns*, 3d. Dist. Seneca No. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, ¶ 25. Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464 (1986).

**{¶133}** "Parties have wide latitude in their closing statements, particularly 'latitude as to what the evidence has shown and what inferences can be drawn from the evidence.'" *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-7085, at ¶ 13, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, at ¶ 213. A prosecutor may comment upon the testimony of witnesses and suggest the conclusions to be drawn. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, at ¶ 16.

**{¶134}** In this case, Stober first argues that the prosecutor made improper comments that Stober was a "liar." In closing arguments, the prosecutor made the following statements that Stober claims were inappropriate.

> **And you know the Defendant is a liar, because he took the stand, and he lied to you about half a dozen times. He lied to you about getting the information from Nancy, [J.L.]'s mom. He lied to you about his conversations with Jim McBride, and some concern about an injury. He lied to you about Lori Fisher, and that his intent behind the masturbation video, is that it go to her. And you know he lied to you, because she – she said so. She said, he never said that to me.**
>
> **\* \* \***
>
> **And he tried to explain text messages and records and give you his thoughts on those. Then he had to acknowledge he wasn't right at all about that, once I started going through the details of those records with him. And he said to you, yeah, [H.Z] and I texted on November 16th, 2011, because she needed a ride, and it was a last-minute thing, so that's why I took her and that's in there. When he made that statement, he didn't realize that the record was going to be shown to him. And when it was, he had to backtrack, because he lied to you.**

(Tr. at 1414-1416).

**{¶135}** While Stober argues that these statements were improper, witnesses did give testimony that directly contradicted Stober's testimony on the stand. As the prosecutor is entitled to urge the jury to make reasonable inferences from the evidence, we cannot find that it was improper for the State to argue that Stober was lying in these specific circumstances.

-54-

{¶136} Stober next contends that the prosecutor improperly "repeatedly tried to have the jurors put themselves in the place of an alleged assault or in the place [of] the alleged victims." (Appt.'s Br. at 24). Stober cites the following segments as being improper.

> **She had to announce the homecoming court later that night, and she recalls with clarity these details, as would you, if it happened to you.**

(Tr. at 1408).

> **\* \* \***

> **And where do these offenses take place? Within the privacy of a closed space, of a room, where there aren't witnesses. And if that wasn't sufficient for a conviction, we wouldn't have convictions in this country for people who commit sex offenses. If that wasn't sufficient, you could be grabbed inappropriately, when no one is around, and no one could do anything about that, but that's not how our system works.**

(Tr. at 1409).

> **Because if you're grabbed, or you're touched sexually, that case can't be prosecuted, can it? If you're touched sexually, and no one is present, people aren't present when these things happen, God help us all, because I can't get justice for you.**[9]

(Tr. at 1440).

> **And if this is not sufficient to establish force, again, God help us all, because if someone comes up to you and grabs your breast,**

---

[9] It should be noted that the Prosecutor used this phrase "God help us all" after defense counsel stated in his closing argument, "[a]nd this is my final comment to you, and I go back to my opening, if this is proof beyond a reasonable doubt, heaven help us all." (Tr. at 1439).

**or your butt, and you don't want it, and you're not asking for it
* * *[.]**

(Tr. at 1443).

{¶137} After reviewing the passages, we find nothing improper by the prosecutor for several reasons. First, as part of Stober's trial strategy, he painted the State's case as a "witch hunt" and challenged the authenticity of the alleged victim's testimony relating to the incidents that happened without corroborating witnesses. The prosecutor's statements in closing argument were in response to that line of questioning. Second, in the latter two cited portions, the prosecutor was merely responding to defense counsel's closing argument that the victims' word alone was not enough to reach the high bar of beyond a reasonable doubt. Thus, we cannot find that these statements were improper. However, even if they were improper, we cannot find that these statements, when taken in context of the entire trial, deprived Stober of a fair trial.

{¶138} Stober next contends that the prosecutor "sought to evoke sympathy for the alleged victims." After reviewing the transcript, we do not find the prosecutor's statements to be improper when viewed in context. For example, Stober argues that the prosecutor improperly stated in closing argument that Karen Fortman "squirmed in her seat" and "she had to pull it together" after meeting alone with Stober. Notwithstanding Stober's argument, this is an accurate

reflection of the transcript, where Fortman testified that she was "obviously" squirming in her seat during the incident, and that she was "extremely" uncomfortable. (Tr. at 317). Fortman also testified that she had to pull herself together to announce the homecoming court later on the night of the incident. (Tr. at 320). Therefore, the prosecutor's statements were a proper characterization of the testimony. We similarly find that the remaining incidents cited by Stober are not improper when taken in context.

{¶139} Stober next argues that the prosecutor improperly elicited testimony from various witnesses during the trial as to "whether they believed and/or supported the alleged victims." (Appt's Br. at 24). After reviewing the transcript, we do not find any of the incidents cited by Stober to be error. For example, Stober contends that Jeff Burke was simply a vouching witness. However, Burke testified that C.K. confided in him long before the allegations in this case were made that she was receiving unwanted messages from a teacher. Burke's testimony countered Stober's counsel's cross examination of C.K., wherein Stober's counsel challenged C.K.'s reasoning for not coming forward earlier.

{¶140} In addition, Stober argues that Detective Roy Sargent was improperly asked about other females who came forward in the investigation and discussed inappropriate messages from Stober. However, Detective Sargent was only asked about the other females *after* Stober's counsel raised the issue, bringing

up a search warrant that mentioned other potential victims existed. We find that this incident, and the remaining incidents cited by Stober were not improper when taken in context.

{¶141} Finally, Stober argues that the prosecutor improperly stated incorrect definitions of the law regarding force during closing arguments. Notwithstanding the prosecutor's statements during closing argument, which we find consistent with the standards discussed previously, the jury was instructed that closing arguments were not evidence. In addition, we have already determined that the trial court's actual jury instructions on force were proper in the context of this case. Thus, having reviewed the prosecutor's statements on force, we cannot find any error that would rise to the level of prejudicial misconduct.

{¶142} In sum, after reviewing the entire record and the arguments made by Stober, we cannot find that prosecutorial misconduct was present in this case. Accordingly, Stober's sixth assignment of error is overruled.

*Seventh Assignment of Error*

{¶143} In Stober's seventh assignment of error, he argues that he was denied his right to effective assistance of counsel. "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.'" *State v. Cassano*, 96

Ohio St.3d 94, 2002-Ohio-3751 at ¶105, quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984). When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

{¶144} A tactical decision by trial counsel, who as a licensed attorney is presumed to be competent, is not by itself enough to show ineffective assistance of counsel simply because the strategy did not result in an acquittal. *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Timm*, 3d Dist. Seneca No. 13-11-23, 2012-Ohio-410, ¶ 31. "Furthermore, trial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Turks*, 3d. Dist. Allen No. 1-08-44, 2009-Ohio-1837, ¶ 43, citing *State v. McKinney*, 11th Dist. Trumbull No. 2007-T-0004, 2008-Ohio-3256, ¶ 191; *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 103.

{¶145} Stober makes a number of arguments on appeal in an attempt to establish that his counsel was ineffective. First, Stober argues that his trial counsel was ineffective for failing to object to the "404(B) witnesses" discussed in the fifth assignment of error. As we have already found that the testimony of these witnesses was permissible, and that in any event, there was no resulting prejudice, we cannot find that Stober's counsel was ineffective for failing to object. This is

particularly true in light of the fact that Stober's counsel clearly wanted to make an issue of these witnesses having not been physically touched by Stober, in an attempt to paint the State's case as a "witch hunt" and a misguided attempt by the State to compare Stober to Jerry Sandusky.

{¶146} Stober next argues that his trial counsel was ineffective for failing to object to leading questions used by the State throughout the trial.   Evidence Rule 611(C) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." This broad exception places the decision of whether to allow leading questions within the sound discretion of the trial court.  *State v. Jackson,* 92 Ohio St.3d 436, 449 (2001); *State v. Jefferson*, 2d Dist. Greene No. 2002 CA 26, 2002-Ohio-6377, ¶ 9.   As a result, the Ohio Supreme Court has held that the failure to object to leading questions does not constitute ineffective assistance of counsel.  *Jackson, supra,* at 449; *State v. Fraker*, 3d Dist. Union No. 14-12-19, 2013-Ohio-4561, ¶ 59.  Thus we cannot find that any failure to object to any leading questions would rise to the level of ineffective assistance of counsel.

{¶147} Stober next argues that his counsel was ineffective for failing to object to "vouching," "demeanor" and "sympathy" testimony from numerous prosecution witnesses.  However, we have already discussed that it was not error for the prosecutor to elicit the testimony cited by Stober under the sixth

assignment of error. Therefore, we cannot find his counsel ineffective for failing to object to this testimony.

{¶148} Finally, Stober argues that his trial counsel was ineffective for failing to object "to rampant hearsay and other improper testimonies." (Appt's Br. at 29). Stober cites only one example of "rampant hearsay." As support, he claims that when Amy Recker was on the stand, Stober's counsel was ineffective for failing to object to Recker's testimony that H.Z. was "depressed," "sad," and was in therapy. At this point in the trial, H.Z. had already testified to severe emotional problems, which ultimately led to her hospitalization. Even if the testimony was impermissible, it was merely cumulative to other testimony, and thus would not be prejudicial. Accordingly, we cannot find that the testimony was prejudicial, or that Stober's counsel was ineffective for failing to object to it.

{¶149} In sum, after reviewing the transcripts and the arguments made by Stober, we cannot find that his counsel was ineffective. Accordingly, Stober's seventh assignment of error is overruled.

*Eighth Assignment of Error*

{¶150} In Stober's eighth assignment of error, he argues that the trial court failed to make the necessary findings under R.C. 2929.14(C) for the imposition of maximum, consecutive sentences.

**{¶151}** "A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law." *State v. Upkins*, 3d Dist. Shelby No. 17-13-02, 2013-Ohio-3986, ¶ 8, citing *State v. Ramos,* 3d Dist. Defiance No. 4-06-24, 2007-Ohio-767, ¶ 23 (the clear and convincing evidence standard of review set forth under R.C. 2953.08(G)(2) remains viable with respect to those cases appealed under the applicable provisions of R.C. 2953.08(A), (B), and (C) * * *). Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus. An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is "'clearly in the better position to judge the defendant's dangerousness and to ascertain the effect of the crimes on the victims.'" *State v. Watkins,* 3d Dist. Auglaize No. 2–04–08, 2004–Ohio–4809, ¶ 16, quoting *State v. Jones,* 93 Ohio St.3d 391, 400 (2001).

**{¶152}** At the outset, we note that recent amendments to R.C. 2929.14(C)(4) now require a trial court to make additional specific findings before imposing consecutive sentences on an offender. While the trial court is required to

make the specific findings, it is not required to list its reasoning for making the findings. *State v. Hill*, 3d Dist. No. 7-12-11, 2013-Ohio-3873, ¶ 22. Nevertheless, with respect to the issues raised in this case R.C. 2929.14(C)(4) states,

> **(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:**
>
> **(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.**
>
> **(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.**
>
> **(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.**

{¶153} Thus, based on the statute, the trial court is required to make three findings before imposing consecutive sentences: 1) that consecutive sentences are necessary to protect the public from the future crime or to punish the offender; 2)

that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and 3) that one of the subsections (a), (b), or (c) apply. *State v. Farnsworth*, 10th Dist. Franklin No. 12CO10, 2013-Ohio-1275, ¶ 8.

{¶154} In this case, the trial court's judgment entry states as follows.

> **The Court has considered the record, oral statements, Defendant's pre-sentence investigation report, as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11 & 2929.12. The Court finds consecutive sentences are necessary to protect the public and punish the Offender, and are not disproportionate. The Court further finds that the convictions are sex offenses.**

(Doc. 188). It is clear from the judgment entry that the trial court made the first required finding, and at least used some of the language of the second required finding, but it did not make any reference to any of the subsections (a), (b), or (c), of R.C. 2929.14(C)(4) that applied, either by utilizing any of the language of the statutory subsection, or by using similar language.

{¶155} At the sentencing hearing, the trial court went further than it did in its entry.

> **The Court finds that consecutive sentences are necessary to protect the public and to punish the offender, are not disproportionate to the counts found guilty by the verdict. The Court finds that the harm is so great or unusual that a single prison term does not adequately reflect the seriousness of the content [sic].**

(Mar. 18, 2013 Tr. at 20). Thus, at the hearing, the trial court more clearly referenced the first two findings it is required to make, and utilized some of the language from subsection (b). However, despite utilizing *some* of the language of subsection (b), the trial court still did not make any finding as to whether "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct[.]"

{¶156} In *State v. Venes*, 8th Dist. Cuyahoga No. 98682, 2013–Ohio–1891, the Eighth District held,

> **[N]ot requiring slavish adherence to the specific wording of the statute is not the same as relieving the court of the duty to make the required "findings." R.C. 2929.14(C)(4) requires the court to make specific "findings." In the past, we have found those findings can be implicit in context when the court's statements during sentencing are intended to encompass the relevant provisions of the sentencing statutes. But in doing so, we have arguably frustrated the purposes underlying the requirement for findings as a predicate for ordering consecutive sentences.**

(Internal citation omitted). *Venes,* at ¶ 14.[10]

{¶157} In this case, we are mindful of the fact that it seems obvious that there are multiple courses of conduct and multiple victims. Nevertheless, in *State v. Farnsworth*, *supra*, the 7th District Court of Appeals held that where the trial court made only two of the three required findings, reversal was warranted for

---

[10] We distinguished *Venes* in *State v. Upkins*, 3d Dist. Shelby No. 17-13-02, 2013-Ohio-3986. In *Upkins*, the trial court did make all the required findings.

resentencing. *See also State v. Brooks*, 9th Dist. Summit Nos. 26437, 26352, 2013-Ohio-2169, ¶ 13 ("[T]his court concludes that [R.C. 2929.14(C)'s] findings must be made at the sentencing hearing on the record. * * * Ideally, those findings would also then be memorialized in the sentencing entry."). In this case, the findings did not fully comply with R.C. 2929.14(C) in either instance.

{¶158} Accordingly, we have no choice but to find that the trial court failed to make adequate findings to support the imposition of consecutive sentences. Therefore, Stober's eighth assignment of error is sustained.

*Ninth Assignment of Error*

{¶159} In Stober's ninth assignment of error, he argues that Stober was denied due process and a fair trial due to errors committed by the trial court, the prosecutor, and Stober's trial counsel. Specifically, Stober contends that the cumulative errors throughout the trial denied Stober his right to a fair trial.

{¶160} Having sustained no errors regarding Stober's *trial*, we cannot find that there are any errors that collectively have a "cumulative" effect to such an extent that Stober was deprived of a fair trial. Nevertheless, to the extent that any errors existed, when taken in context of the entire trial, they are not sufficient to support reversal. Accordingly, Stober's ninth assignment of error is overruled.

{¶161} For the foregoing reasons, the judgment of the Putnam County Common Pleas Court is affirmed in part, and reversed in part and remanded to the

trial court for resentencing to consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to enter the proper findings on the record.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**